UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   CV 03-B-3056-S |
| | ) |
| $1,185,135.00 IN UNITED STATES CURRENCY, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

This case is presently pending before the court on Motion to Suppress or Exclude, (doc. 23),[1] filed by claimant Jose De Jesus Franco Cazarez, and plaintiff's Motion for Summary Judgment, (doc. 26), filed by plaintiff the United States of America [hereinafter "the Government"]. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that the Government's Motion for Summary Judgment, (doc. 26), is due to be granted, and Cazarez's Motion to Suppress or Exclude, (doc. 23), is due to be denied.

**I. SUMMARY JUDGMENT STANDARD**

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every ***reasonable*** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. STATEMENT OF FACTS

On June 18, 2003, Officer Ernest Ryan of the Bessemer Police Department stopped Jose De Jesus Franco Cazarez, who was driving south on I-59, for speeding. (Doc. 23, Att.

1 at 18; doc. 39, Att. 3.) Cazarez was driving 60 mph in a 55 mph construction zone. (Doc. 23, Att. 1 at 19-20.)

Officer Ryan asked to see Cazarez's driver's license and proof of insurance. (*Id*. at 27.) Cazarez handed Officer Ryan "some type of Mexican ID" and a rental agreement for the car. (*Id*.) The rental agreement was in the name "Isaac Valdez" of San Diego, California, and the identification card was in the name "Jose De Jesus Franco Cazarez." (*Id*. at 28, 33; doc. 39, Atts. 7 and 10.) The rental agreement also indicated that the car was overdue to be returned. (Doc. 23, Att. 1 at 29; doc. 39, Att. 10.)

Officer Christen Clemons arrived on the scene. (Doc. 23, Att. 1 at 33.) Officer Ryan asked Officer Clemons "to run [Cazarez's] information through EPIC." (*Id*., Att. 2 at 7.) EPIC$^2$ is the El Paso Intelligence Center. (*Id*., Att. 1 at 34.)

Cazarez told Officer Ryan "that he was from Mexico and that he owned a business and he buys and sells trucks and crossed the border really just daily." (*Id*. at 35.) He told Officer Ryan that his last border crossing was on June 13, 2003. (Doc. 39, Att. 4 at 4.) However, EPIC reported no border crossings under Cazarez's name. (Doc. 23, Att. 2 at 9.)

---

$^2$EPIC is an advanced federal data base that "coordinates intelligence gathering operations for various federal law enforcement agencies, including the Marshal's Service, DEA, and the Customs Service." *United States v. Doggett*, 906 F.2d 573, 576 n.3 (11th Cir. 1990); *rev'd* 505 U.S. 647 (1992). "EPIC contains information about border crossings." *Chavez v. Illinois State Police*, 27 F. Supp. 2d 1053, 1062 n.1 (N.D. Ill. 1998), *aff'd but criticized on other grounds*, 251 F.3d 612 (7th Cir. 2001).

Officer Clemons also ran the name "Isaac Valdez" through EPIC. (*Id*. at 10-12.) EPIC reported a border crossing for Valdez on June 14, 2003. (*Id*. at 12; doc. 39, Att. 4 at 4.)

Officer Ryan testified that, at this point, the discrepancy in Cazarez's story and the information from EPIC, together with the overdue rental agreement in another person's name, caused him to suspect Cazarez was involved in drug activity. (*Id*., Att. 1 at 39-40, 96.) Nevertheless, Officer Ryan gave Cazarez a warning ticket and told him that he was "free to go." (*Id*. at 43; doc. 27 (video tape) at 16:49.)[3]

After shaking hands with Cazarez, Officer Ryan asked him if he would mind answering a few questions, and Cazarez replied, "O.K., yeah." (*Id*. at 16:49-:50; doc. 23, Att. 1 at 44-45.) Officer Ryan asked Cazarez if he was carrying illegal drugs or a large amount of money. (Doc. 27 at 16:49-:50; doc. 23, Att. 1 at 45.) Cazarez told Officer Ryan that he had $8,000 in a valise on the front seat of the car and baggage and presents in the trunk. (Doc. 27 at 16:50.) Cazarez asked Officer Ryan if he wanted "to see," to which Officer Ryan responded, "You don't mind me searching your car, right?" (*Id*.) Cazarez stated that he did not know the law and that he was in a hurry, but he told Officer Ryan that he could "check everything." (*Id*. at 16:50-:51.) Officer Ryan told Cazarez that, if he consented to the search, Officer Ryan was going to search the car for drugs and a large amount of US currency. (*Id*.) He also told Cazarez that, if he said "no," that Officer Ryan had the right to run his dog

---

[3]The videotape of that traffic stop displays the time of day in the upper right hand corner. (Doc. 27.) Citations to the videotape reference the relevant time according to this display.

around the car. (*Id*. at 16:51.) Officer Ryan told Cazarez that he had the right to refuse to consent, and Cazarez told Officer Ryan that he did not understand. (*Id*.) Ryan then explained:

> O.K., look.  This is how it is, O.K.?  I ask permission to search the car.  You have the right to say "yes" or "no," O.K.?  Once you say "no", if I have enough reasonable suspicion to believe you may be transporting illegal drugs and what I do is I have a K-9 that I get out of my car and what I do, he'll run around your car and, if he indicates on your car, then I have the right to search it, O.K.?  You're free to go, but I can detain the car.

(*Id*. at 16:51-:52.) Cazarez responded that he was familiar with dogs because of his experiences at the border, and he told Officer Ryan that he could check his car with the dog. (*Id*. at 16:52.) He told Officer Ryan that, if his "dog [said] something," he could check the car. (*Id*. at 16:52.) Then, Officer Ryan got Dusty out of the car. (Doc. 23, Att. 1 at 57-58.)

Dusty is a "dual purpose patrol dog." (*Id*. at 8.) He is trained to track and to apprehend drugs. (*Id*. at 8-9.) He has been trained to alert on the odor of "cocaine, meth, heroin, [and] marijuana," but not on the odor of currency. (*Id*. at 87.) Dusty indicates an alert by sitting. (*Id*. at 127.)

Dusty alerted on the trunk area of Cazarez's car. (*Id*. at 58; doc. 27 at 16:59.) Officer Ryan told Cazarez that the dog had alerted, and Cazarez asked Officer Ryan if he wanted to search the car. (Doc. 27 at 17:00.) Officer Ryan told him they were going to search the car. (*Id*.) Officer Ryan again asked if there were drugs or a large amount of money in the car, to which Cazarez told him "no." (*Id*.)

5

Officers Ryan and Clemons began to search the car; Officer Clemons started at the trunk. (Doc. 23, Att. 1 at 59.) Officer Clemons removed a bag from the trunk, opened it, and found "a lot" of money. (*Id.*, Att. 2 at 19.) The bundles of cash were rubber-banded and some of the bundles were wrapped in a clear plastic wrap. (*Id.* at 30; *id.*, Att. 3 at 12.) After discovery of the cash, Officer Ryan told Cazarez they had found money in the trunk. (Doc. 27 at 16:02.) Cazarez told Officer Ryan that the bag was not his and that some of the bags in the car belonged to other people. (*Id.* at 17:02; doc. 23, Att. 1 at 61; *id.*, Att. 2 at 20.) Officer Ryan asked Cazarez to sit in the front of the police car, and, then, he began reviewing the disclaimer and waiver form with Cazarez. (Doc. 27 at 17:02-:03, 17:05-:10.)

Cazarez said the only bag in the car that belonged to him was the valise in the front seat. (*Id.* at 17:06.) He said the bags in the trunk and the one on the back seat were not his bags. (*Id.*) Officer Ryan told Cazarez that by signing the disclaimer form he was saying that "[he did not] have any control of [the seized] money, [he did not] want this money, [and the] money's not [his]." (*Id.* at 17:08.) He told Cazarez that the money was going to be seized and that signing the disclaimer form meant that Cazarez did not want the money. (*Id.* at 17:08-:09.) To which Cazarez replied that the money was not his and that he had been used. (*Id.* at 17:09.) Officer Ryan told Cazarez, "If you agree . . . that money is not yours [and] you have no ownership and no part of that money, you need to print your name and sign [the disclaimer form]." (*Id.* at 17:10.) Cazarez signed a disclaimer form and told Officer Ryan that he did want the money "over and over and over." (*Id.* at 65, 69; doc. 39, Att. 4.)

6

The disclaimer form, signed by Cazarez, states:

That I, Jesus Franco, hereby disclaim any and all interest I may have in the undetermined amount of U.S. Currency that has been detained by the Bessemer Police Department. I further waive the right to plead or answer in the forfeiture action concerning the above referenced currency, seized from me on this 18 day of June, . . . 2003.

I hereby waive and disclaim any and all interest in the currency sought to be forfeited and agree that this cause may be tried and judgement entered without further notice to me.

The undersigned hereby declares that he/she has completely read or has had read and explained to him/her and fully understands and voluntarily accepts the terms contained herein.

(Doc. 39, Att. 4.)

Officer Ryan asked Cazarez if he would voluntarily go to the police station and if it was "OK" for another officer to drive his car while he rode to the police station in the back seat of a police car. (Doc. 27 at 17:12-:13.) Cazarez responded to each request with "yeah" or "O.K." (*Id.*) Officer Ryan repeatedly asked if Cazarez's decision to go the police station was voluntary; each time Cazarez replied affirmatively. (*Id.*)

The entire stop, including the trip to the police station, was videotaped. (*See id.*) The videotape reveals that Cazarez was not pressured or otherwise coerced to consent to answer questions, to let the dog run around his car, to consent to the search of his vehicle, to sign the Voluntary Disclaimer form, or to accompany the officers to police station. (*See* doc. 27.)

At the police station, Cazarez spoke with Robert Michael Bellanca, a detective with the Bessemer Police Department assigned to the Drug Enforcement Administration ["DEA"]

HIDTA[4] Task Force agent. (Doc. 23, Att. 3 at 5.) Cazarez told Detective Bellanca that three men[5] had given him four suitcases to take to Phoenix, Arizona. (*Id*. at 47.) He continued to disclaim any interest in the money; he told Detective Bellanca that he was just transporting the money for the other men. (*Id*., Att. 3 at 49.) At the request of Detective Bellanca, Cazarez agreed to telephone Damien and Ramon, the people for whom he was transporting the money. (*Id*. 56-57.) During the recorded telephone calls, Cazarez repeatedly stated that the money was not his and that Damien and Ramon had not told him the money was in the bags. (*Id*. at 62; doc. 39, Att. 1.) After his interview with Detective Bellanca, Cazarez left in his rental car, but Detective Bellanca kept the money. (Doc. 23, Att. 3 at 27.)

Detective Bellanca and six or seven other Bessemer police officers transported the money to the DEA office, where it was sealed in evidence bags and put in a safe. (*Id*. at 38-39.) The next day it was taken to the bank and counted. (*Id*. at 39.) The amount of the seized currency was $1,185,135. (Doc. 39, Att. 6 at 6.)

Detective Bellanca recovered a list of telephone numbers from Cazarez's car. (Doc. 23, Att. 3 at 15.) One of the telephone numbers belonged to an indicted fugitive "responsible for bringing in multi-hundred kilogram loads of cocaine from Mexico to Los Angeles and then distributing it to Chicago." (*Id*..) Detective Bellanca also found identification and a

---

[4]HIDTA stands for "high intensity drug trafficking area." (Doc. 23, Att. 3 at 5.)

[5]Bellanca testified that Cazarez told him the bags belonged to "Damien, Ramon and [a] third person whose name he didn't know, but who rented the car for him – of course, the car is rented in the name of Isaac Valdez." (Doc. 23, Att. 3 at 47.)

credit card in the name "Isaac Valdez Burat or Burat Valdez;" "Isaac Valdez" was the name on the rental agreement. (*Id*. at 17, 50.)  Detective Bellanca testified:

> And Burat Valdez had recently been indicted for money laundering of two point – he was caught in the possession of 2.4 million dollars.
>
> That was part of an investigation in which 200 – I think it was like 260 kilograms were seized in two locations. One that was – one, a couple hundred – a hundred and forty were seized.
>
> One from Kansas, two Chicago, which is –
>
> . . .
>
> – which is one of the locations that Cazarez said he had been to for the – the people that he was transporting this money [for].
>
> And another hundred or so were seized in Newark, New Jersey, which is where he was coming from in this particular instance.

(*Id*. at 17-18.)

The Government filed this forfeiture action on November 14, 2003. (Doc. 1.) Cazarez filed a Verified Claim, which stated:

> Comes now Jose De Jesus Franco Cazarez and makes this verified claim to the above referenced United States currency which was unlawfully seized from his lawful possession by officers of the Bessemer[,] Alabama Police Department in June of 2003 in the Northern District of Alabama. Claimant furthers states that a portion of said currency belongs to him and the remainder was in his lawful possession as agent for another and therefore contests this attempt at forfeiture by the government.

(Doc. 5.)  No one other than Cazarez has filed a claim to the $1,185,135.

### III. DISCUSSION

**A. CAZAREZ'S STANDING**

The Government contends that claimant, Cazarez does not have standing to contest the forfeiture. "[S]tanding under Article III of the Constitution . . . is a threshold matter required for a claim to be considered by the federal courts. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975)(Standing is 'the threshold question in every federal case, determining the power of the court to entertain the suit.')." *Via Mat Intern. South America Ltd. v. United States*, 446 F.3d 1258, 1262 (11th Cir. 2006). Therefore, the court will consider the issue of Cazarez's standing to contest the forfeiture prior to addressing any other issue.

"It is well established that in order to contest a forfeiture, a claimant first must demonstrate a sufficient interest in the property to give him Article III standing; otherwise, there is no 'case or controversy,' in the constitutional sense, capable of adjudication in the federal courts." *United States v. $38,000.00 Dollars in U.S. Currency*, 816 F.2d 1538, 1543 (11th Cir. 1987). "To have standing to contest a § 881(a)(6) forfeiture, a claimant must have an ownership or possessory interest in the property seized." *United States v. Carrell*, 252 F.3d 1193, 1201 (11th Cir. 2001)(quoting *United States v. Four Million, Two Hundred Fifty-Five Thousand*, 762 F.2d 895, 907 (11th Cir. 1985)).

> At the heart of Article III standing is the existence of an injury, not ownership. Ownership of property that has been seized can be evidence of the existence of an injury that is direct enough to confer standing, but ownership is not required; non-owners, such as bailees or those with possessory interests, can also have injuries resulting from the seizure of property that are sufficient to establish standing. *See United States v. $38,000.00 in U.S. Currency*, 816 F.2d

> 1538, 1544 (11th Cir. 1987)("A claimant need not own the property in order to have standing to contest its forfeiture; a lesser property interest, such as a possessory interest, is sufficient for standing . . . . As a bailee, [the plaintiff] has a possessory interest in the bailed currency . . . [and] has Article III standing to contest the forfeiture of the currency."); *United States v. $260,242.00 in U.S. Currency*, 919 F.2d 686, 687-88 (11th Cir. 1990)("[A] possessory interest generally is constitutionally sufficient for claims in forfeiture actions.").

*Via Mat*, 446 F.3d at 1262-63 (footnote omitted). "However, not just any purported injury or interest is sufficient – 'straw owners' and persons who might have unknowingly been in possession of property that is seized do not necessarily suffer an injury that is sufficient to demonstrate standing. *Id*. 1262 n.5 (citing *United States v. Cambio Exacto*, 166 F.3d 522, 527-28 (2d Cir. 1999)). Although, "[n]o one can question the standing of a bailee or agent to attack a forfeiture of property subject to a lawful or even colorably lawful bailment or agency," . . . "[u]nexplained naked possession of a cash hoard in the factual setting of this case does not rise to the level of the possessory interest requisite for standing to attack the forfeiture proceeding." *United States v. $321,470.00, United States Currency*, 874 F.2d 298, 304 (5th Cir. 1989).

The Government has raised the issue of his lack of standing in a summary judgment motion; therefore, Cazarez "can no longer rest on [the] 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" that establish his standing to contest the forfeiture. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Center For Biological Diversity v. Lueckel*, 417 F.3d 532, 537 (6th Cir. 2005)("Because the plaintiffs' standing was challenged in a motion for summary judgment, the plaintiffs must, in the words of Rule 56,

Fed. R. Civ. P., 'set forth specific facts,' in affidavits or through other evidence, demonstrating that each element of standing is satisfied.")

The evidence shows that Cazarez voluntarily and repeatedly disclaimed any ownership or other interest in the seized currency.[6] He has presented nothing in response to the Government's Motion for Summary Judgment to establish that he has suffered or will suffer an injury if the money, or a portion thereof, is not returned to him. Therefore, he has not established that he has suffered or will suffer any injury as a result of the seizure of the currency in which he disclaimed any ownership or interest.

In opposition to the Government's Motion for Summary Judgment, Cazarez contends, "Any waivers, disclaimers, assertions and statements made after the officer pulled [him] over in the first place must be suppressed in their totality" based on alleged illegalities in his stop and detention and because he was never given his *Miranda* warning before he signed the waiver and disclaimer and before making any statements. (Doc. 29 at 8.) However, Cazarez does not have standing to challenge the traffic stop and subsequent seizure of currency because he has not established his standing to contest the forfeiture. *See United States v.*

---

[6]At the time he was stopped, Cazarez repeatedly stated that he did not know that the money was in the bags at the time the three men gave him the bags. This lack of knowledge of the contents of the bags at the time he received them prevents Cazarez from arguing that he acted pursuant to a bailment arrangement. *See Dunavant Enterprises, Inc. v. Strachan Shipping Co.*, 730 F.2d 665, 668 (11th Cir. 1984)("A bailment requires the change of possession, actual or constructive, and the bailee must have **voluntarily assumed the custody and possession of the property for another**. Change of possession necessarily requires a change of actual or constructive control over the item of property.")(emphasis added; internal quotations and citations omitted).

*$321,470, United States Currency*, 874 F.2d 298, 300 (5th Cir. 1989)(affirming district court holding that the claimant's lack of standing rendered moot his motion to suppress.) Therefore, Cazarez's Motion to Suppress or Exclude will be denied.[7]

The court finds that the Government has shown that Cazarez effectively waived his right to contest the forfeiture and disclaimed all interest and ownership in the seized currency at the time the currency was seized. Cazarez has not rebutted this showing. Without a showing of some ownership or other interest in the seized currency, he cannot establish his standing to contest the forfeiture. *See United States v. $38,000.00 Dollars in U.S. Currency*,

---

[7] Although the court does not reach the issue of the legality of the search and seizure of the currency, the court notes that the evidence demonstrates that the stop was based upon probable cause that Cazarez was exceeding the speed limit. *See Whren v. United States*, 517 U.S. 806, 819 (1996); *United States v. Pruitt*, 174 F.3d 1215, 1217 n.1 (11th Cir. 1999); *see also United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998)("As the district court correctly stated, law enforcement 'may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles.'")(quoting *United States v. Strickland*, 902 F.2d 937, 940 (11th Cir. 1990)). Moreover, the court is of the opinion that the videotape demonstrates that Cazarez voluntarily agreed to answer Officer Ryan's questions after Officer Ryan clearly told him he was free to go, and that he voluntarily consented to allow Dusty to sniff around his car. *See United States v. Bentley*, 151 Fed. Appx. 824, 827-28, 2005 WL 2334366, 3 (11th Cir. 2005)(setting forth factors to consider in determining the voluntariness of a consent to search); *see also* doc. 27. Once Dusty alerted on the car, Officers Ryan and Clemons had probable cause to search the car, even absent Cazarez's consent. *See United States v. Tamari*, No. 05-10618, 2006 WL 1843007, *5 (11th Cir. July 6, 2006)("We have long recognized that 'probable cause arises when a drug-trained canine alerts to drugs.'")(quoting *United States v. Banks*, 3 F.3d 399, 402 (11th Cir. 1993); citing *United States v. Dunkley*, 911 F.2d 522, 527 (11th Cir. 1990) and *United States v. Puglisi*, 723 F.2d 779, 783 (11th Cir. 1984)).

Therefore, even if the court were to assume that Cazarez had standing to contest the forfeiture, his Motion to Suppress or Exclude would nevertheless be denied.

816 F.2d 1538, 1543 (11th Cir. 1987). Therefore, summary judgment in favor of the Government is mandated.[8] The Government's Motion for Summary Judgment will be granted and Cazarez's claim will be dismissed. Also, because Cazarez lacks standing to contest the forfeiture, his Motion to Suppress and Exclude is due to be denied. *See Morrison v. Allstate Indem. Co.*, 228 F.3d 1255, 1260-61 (11th Cir. 2000).[9]

---

[8]The Supreme Court has held:

> [T]he plain language of Rule 56(c) ***mandates*** the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)(emphasis added).

[9]The *Morrison* court held:

> Federal courts have limited subject matter jurisdiction, or in other words, they have the power to decide only certain types of cases. *See University of South Alabama v. American Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999). While Article III of the Constitution sets the outer boundaries of that power, it also vests Congress with the discretion to determine whether, and to what extent, that power may be exercised by lower federal courts. *See Palmore v. United States*, 411 U.S. 389, 400-01 (1973). Consequently, lower federal courts are empowered to hear only cases for which there has been a congressional grant of jurisdiction, and once a court determines that there has been no grant that covers a particular case, the court's sole remaining act is to dismiss the case for lack of jurisdiction. *See University of South Alabama*, 168 F.3d at 409-10.

**B. FORFEITURE**

Because the court finds Cazarez has no standing to contest the forfeiture and because no other claims for the currency have been filed, the Government is entitled to a default judgment. *See United States v. $263,980*, No. 95-55676, 1996 WL 36183, *1 (9th Cir. Jan. 30 1996) [unpublished]; *United States v. $13,085.00 in United States Currency*, CV 97-H-1295, doc. 12 (N.D. Ala. Jan. 6, 1998). Nevertheless, the court finds that the Government has established that the seized currency is due to be forfeited as "moneys . . . furnished or intended to be furnished by any person in exchange for a controlled substance [or] proceeds traceable to such an exchange."

The Government contends that sufficient evidence of record establishes that the seized currency is subject to forfeiture. (*See* doc. 25 at 14-24.) The Eleventh Circuit has established the following guidelines for determining whether the Government has shown that the currency at issue is due to be forfeited:

> Under the civil forfeiture statute applicable to this case, "[a]ll moneys . . . furnished or intended to be furnished by any person in exchange for a controlled substance . . ., all proceeds traceable to such an exchange, and all moneys . . . used or intended to be used to facilitate any violation of" the drug laws "shall be subject to forfeiture to the United States." 21 U.S.C. § 881(a)(6) (1994). The government has the initial burden of showing probable cause to believe that the money is the proceeds of, or is otherwise connected

---

*Morrison*, 228 F.3d at 1260-61.

to, any illegal drug transaction. *United States v. Carrell*, 252 F.3d 1193, 1201 (11th Cir. 2001).

Probable cause in this context is a "reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion – the same standard used to determine the legality of arrests, searches, and seizures in criminal law." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Counties*, 941 F.2d 1428, 1440 (11th Cir. 1991)(internal quotation marks and citations omitted); *see also United States v. Cleckler*, 270 F.3d 1331, 1334 (11th Cir. 2001)(per curiam)(same); *United States v. Four Parcels of Real Prop. on Lake Forrest Circle*, 870 F.2d 586, 590 n.10 (11th Cir. 1989)(probable cause in this context is "the same standard used to determine the legality of arrests, searches, and seizures in criminal law"); *United States v. $364,960.00*, 661 F.2d 319, 323 (5th Cir. Unit B 1981)(noting "that the definition of probable cause applicable here is the same as that which applies elsewhere").

The government may use both circumstantial evidence and hearsay evidence to show probable cause. *Four Parcels of Real Prop. in Greene & Tuscaloosa Counties*, 941 F.2d at 1440. It does not need to show a relationship between the property and a particular drug transaction – only that the property was related to some illegal drug transaction. *Id.* Further, "that the evidence presented would support an alternative hypothesis does not prevent it being probative on the issue of probable cause." *Id*. (internal quotation and citation omitted). In other words, if the evidence could support a finding that the currency was derived from or significantly related to an illegal drug transaction, and that same evidence viewed another way could also support a finding that the money was linked to another type of transaction, the district court is not prevented from finding that evidence probative on the issue of probable cause.

Finally, "[i]n evaluating the evidence of proceeds traceable to drug transactions, we have eschewed clinical detachment and endorsed a common sense view to the realities of normal life applied to the totality of the circumstances." *Carrell*, 252 F.3d at 1201 (internal quotation marks and citations omitted); *see also Four Parcels of Real Prop. in Greene & Tuscaloosa Counties*, 941 F.2d at 1440 ("[T]he existence of probable cause is judged not with clinical detachment, but with a common sense view to the realities of normal life." (internal quotation marks and citations omitted)); *United States v. $4,255,000.00*, 762 F.2d 895, 904 (11th Cir. 1985)(same).

*U.S. v. $242,484.00*, 389 F.3d 1149, 1159-60 (11th Cir. 2004).

> Some of the facts the court considers are:
>
> (a) the amount of money involved; (b) the bulk of the currency; (c) whether the currency is transported by courier; (d) how the money is bundled; (e) how the bundles of money are wrapped; (f) the significance of the route being traveled; (g) peculiarities in the trip itinerary; (h) whether the person carrying the money knows the identity of the currency's owner; (i) whether the person who was carrying the money made false, inconsistent, or implausible statements to the police; (j) whether there is a lack of documentation supporting the story of the person carrying the money; (k) whether a trained narcotics detection dog alerted to the odor of narcotics; (l) other intelligence linking the person or the money to illegal drugs; and (m) whether the owner of the currency claimed the currency.

(Doc. 25 at 15 (citing *$242,484.00*, 389 F.3d 1149 (11th Cir. 2004)(en banc)).

The court finds that "[t]he totality of these circumstances," as set forth above in the statement of facts, "establish[es] reasonable grounds for believing that the [$1,185,135 seized from Cazarez] is substantially connected to illegal drug activities," and, therefore, subject to forfeiture. *See $242,484.00*, 389 F.3d at 1168.

## **CONCLUSION**

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and the Government is entitled to judgment as a matter of law. An Order granting the Government's Motion for Summary Judgment, (doc. 26); denying Cazarez's Motion to Suppress or Exclude, (doc. 23); and ordering the seized currency forfeited will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this the 12th day of September, 2006.

*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE